(No. 4750. December 30, 1927.)

BIG WOOD CANAL COMPANY, a Corporation, Respondent, v. S. H. CHAPMAN, as Watermaster, Defendant, and BENOIT H. BERNARD et al., Intervenors and Appellants.

[263 Pac. 45.]

WATERS AND WATERCOURSES — WATERMASTER — TERM OF OFFICE — SUPPLEMENTAL ADJUDICATION — OPERATING COMPANY'S INTEREST — ENGINEER'S CERTIFICATE — PRESUMPTION — STATE CONTRACT — APPLICATION AND PERMIT — CONSTRUCTION AND COMPLETION OF WORKS — PROOF OF APPLICATION TO BENEFICIAL USE — PUBLICATION OF NOTICE—AMENDMENT OF LISTS OF LAND—RIGHTS TO FLOOD WATERS—CONSTITUTIONAL LAW—PROOF OF APPLICATION— LEGISLATIVE ACT EXTENDING TIME—LEGISLATIVE CONTROL AND CLASSIFICATION—DISTRIBUTION OF WATER—DECREED RIGHTS—PRESCRIPTION—PRIORITY UNAPPROPRIATED PUBLIC WATERS—APPLICATION FOR PERMIT—VESTED RIGHTS.

1.   A watermaster being a "public administrative officer" under C. S., sec. 74, he holds office until his successor is elected or appointed and qualified, sections 5609 and 5612 not confining his term to the irrigation season, and hence a watermaster elected March, 1922, and who had not been removed, was the proper party defendant in an action by an operating company begun on February 7, 1923, for summary supplemental adjudication of water rights under section 7036.

2.   Where, under construction company's contract with state, an operating company was to be formed to manufacture, own and control irrigation system as soon as completed, operating company became equitable owner of system and water rights, on system being completed and turned over to it, and it had sufficient interest to support action for summary supplemental adjudication of water rights under C. S., sec. 7036, although no formal conveyance of title was made until after commencement of action.

3.   Where state engineer's certificate of completion of irrigation works stated that permittee had complied with provisions of law as to proof of completion, it will be presumed, in absence of evidence to the contrary, that engineer performed his duty and made the examination and inspection of works required by Laws 1903, p. 229, sec. 5, in order to make such certificate.

4. That state refused to finally accept an irrigation system as complete performance of construction contract does not indicate that permittee has not completed works in accordance with permit and application, under C. S., sec. 5575, where specifications of contract were far more in detail as to work to be done than conditions of permit and contracts were subject to approval by state.

5. Where record shows that notice of permittee's intention to submit proof of application of water to beneficial use, over state engineer's signature, was actually published as required by law, it will be presumed, in absence of evidence to the contrary, that such notice was published only after previous notice to engineer, as required by law, of readiness to do so, and order by engineer for such publication.

6. Under C. S., sec. 5571, it is proper to approve applications, for amendment of list of lands to be reclaimed, where no additional water is asked for and rights of others are not adversely affected by such amendment.

7. In view of C. S., sec. 5556, vesting control of all waters in state, where state contracts for construction of irrigation system expressly provided for storage dams to store all waters of certain rivers not otherwise appropriated, permittee was authorized to appropriate all waters of such streams, whether direct flow or flood, or winter flow, up to amount specified in permit.

8. Laws 1913, chap. 37, and Laws 1915, chap. 94, sec. 1, extending time for making proof of application of water to beneficial use by permittee six and ten years, respectively, after date for completion of works, *held* not, as to permittee having superior unperfected rights, retroactive and void under Const., art. 11, sec. 12, nor did they deprive permittees having inferior rights of their property without due process of law, in violation of Const. U. S., Amend. 14, and state Const., art. 1, sec. 13, since a permittee by application acquires only an inchoate and contingent right, and permit is not an appropriation of public water nor is it real property.

9. The legislature may by proper legislation, as has been done by C. S., sec. 5568 et seq., regulate the appropriation and use of public waters.

10. Laws 1915, chap. 94, sec. 1, extending, in cases where irrigation system covers more than 25,000 acres, the time to prove application to beneficial use, eliminating necessity for describing lands irrigated by legal subdivisions, and requiring proof only of application of water to lands within project, *held* not unconstitutional as class legislation, since as to such matters there are

Points Decided.

reasonable differences which distinguish a large from a small irrigation project.

11. The legislature may lawfully distinguish, select and classify objects of legislation, and if classification is practical, it is sufficient and is not reversible unless palpably arbitrary.

12. Question of classification is primarily for legislature, and for court to interfere it must be able to say that there is no fair reason for the law, and burden of showing that law is unreasonable and arbitrary rests on one assailing it.

13. Discrimination in legislation must rest on some reasonable ground of difference between persons or things included and those excluded, having regard to purpose of legislation, and, within sphere of its operation, statute must affect all persons similarly situated.

14. The constitutional requirement of uniformity in case of general law is complied with if it operates alike upon all persons or property under the same circumstances and conditions.

15. The distribution of water to a decreed right, in time of water scarcity, in preference to a previous undecreed right, is based upon duty of watermaster under C. S., sec. 5611, to give preference in distribution to decreed rights, and hence cannot form basis of a right to use of water by prescription.

16. When right to use of unappropriated public waters has been initiated by application for permit and proper steps have been taken to perfect such right by compliance with conditions of permit, right becomes vested and dates back to issuance of permit.

APPEAL from the District Court of the Fourth Judicial District, for Lincoln County. Hon. Robert M. Terrell, Judge.

Publisher's Note.

12. See 6 R. C. L. 384–386.

13. See 6 R. C. L. 378.

See Constitutional Law, 12 C. J., sec. 221, p. 794, n. 20; sec. 855, p. 1128, n. 14, p. 1129, n. 22, p. 1130, n. 27, 31.

Evidence, 22 C. J., sec. 70, p. 140, n. 52 New.

Statutes, 36 Cyc., p. 992, n. 91.

Waters, 40 Cyc., p. 697, n. 52, p. 703, n. 93, 94, p. 711, n. 59 New, 63, p. 714, n. 84 New, p. 721, n. 24, p. 730, n. 86 New, p. 732, n. 12, p. 814, n. 61 New.

Action by Big Wood Canal Company against S. H. Chapman, watermaster of Big Wood River District No. 7A, for the purpose of determining, under a summary supplemental adjudication statute, the water rights of the plaintiff, subject to the terms of a previous decree; Benoit H. Bernard and others intervene. Judgment for plaintiff, and intervenors appeal. *Affirmed.*

Martin & Martin, for Appellants.

Under the statutes of this state a watermaster of a water district is not a continuing office but such person is only watermaster between the dates fixed in the statute, to wit, when called upon for services after his election on the first Monday in March of any one year until the close of the irrigation season and in no event after the first day of November of any year. (C. S., sec. 5612.)

Under the contract with the state and the statutes of the state, the respondent was not the owner of the irrigation works built by the Idaho Irrigation Company, Ltd., and the water rights acquired by such company, but its only authority is the operation of such works and the distribution of the water to the owners of the water rights, with power to levy assessments to pay the expenses of operation, and had no power to bring this action. (C. S., sec. 6634; Carey Act, 8 Fed. Stats. Ann., 2d ed., 698, 28 Stats. at L. 422; C. S., secs. 2996–2998, 3000, 3001, 3004, 3008, 3009 and 3040; *Boley v. Twin Falls Canal Co.,* 37 Ida. 318, 217 Pac. 258; *Ireton v. Idaho Irr. Co.,* 30 Ida. 310, 164 Pac. 687.)

In locating and perfecting a water right under the laws of Idaho a substantial compliance with the statutes of the state in regard thereto is necessary. (*Basinger v. Taylor,* 30 Ida. 289, 164 Pac. 522, 36 Ida. 591, 211 Pac. 1085.)

Under well-established rules of statutory construction acts of the legislature will be construed as having only a prospective operation unless the purpose and intention of the legislature to give them a retrospective or retroactive effect is clear. (C. S., sec. 9443; *Peavy v. McCombs,* 26 Ida. 143,

140 Pac. 965; *Bellevue State Bank v. Lilya,* 35 Ida. 270, 205 Pac. 893; *United States v. McPhee,* 51 Colo. 425, 118 Pac. 996; *Aberdeen-Springfield Canal Co. v. Bashore,* 36 Ida. 818, 214 Pac. 209.)

Under the laws of Idaho a water right is real property and title thereto may be acquired by prescription or adverse user in the same manner as any other real property. (C. S., sec. 5325.)

An appropriator of water under the statutes of Idaho can protect his right as against a subsequent appropriator who is using the water first appropriated and adversely to the first appropriator prior to the time of making final proof of the application of such water to a beneficial use and the issuance of a license by the state confirming his appropriation. (*Mays v. District Court,* 34 Ida. 200, 200 Pac. 115; *Lambrix v. Frazier,* 31 Ida. 382, 171 Pac. 1134; *Basinger v. Taylor, supra; Sandpoint Water etc. Co. v. Panhandle Development Co.,* 11 Ida. 405, 83 Pac. 347.)

Bissell & Bird, for Respondent.

Having been elected and having served as watermaster for several seasons, beginning prior to the institution of the present action and extending until after its hearing, Chapman was the administrative officer of the district whom C. S., sec. 7036, contemplates the action should be brought against, and, therefore, the court obtained jurisdiction of the cause, even though the action may not have been filed at a time when Chapman had actually been called to begin work in the manner authorized by C. S., sec. 5612. (C. S., secs. 74, 5609 and 7036; *Clark v. Wonnacott,* 30 Ida. 98, 162 Pac. 1074; *Mays v. District Court,* 34 Ida. 200, 200 Pac. 115.)

Respondent was the proper party plaintiff, because a Carey Act operating company is the legal owner of the water rights and system, in preference to its stockholders, the settlers upon the project. (*Boley v. Twin Falls Canal*

*Co.,* 37 Ida. 318, 217 Pac. 258; *State v. Twin Falls Canal Co.,* 21 Ida. 410, 121 Pac. 1039, L. R. A. 1916F, 236.)

Respondent's application for permit was amended by adding additional water was sought thereby, and it has not been shown where the rights of others have been adversely affected, the priority date under said amended application should date from the time of the original application and permit.   (C. S., sec. 5571.)

Respondent's permit and license include all the unappropriated water in the streams mentioned and are not restricted to the natural flow thereof.   (C. S., sec. 5556.)

The granting of the permit by the state officials initiated a water right in respondent's predecessor, and in conjunction with a substantial compliance with the conditions and limitations prescribed therein and the applicable statutory provisions, ripened into a vested water right evidenced by the license, with the date of priority as of the same date as the permit.   (C. S., sec. 5579.)

HARTSON, Commissioner.—On August 21, 1907, the Idaho Irrigation Company, Ltd., respondent's predecessor in interest, contracted with the state of Idaho to build, under the Carey Act (43 U. S. C. A., sec. 641), and acts amendatory and supplemental thereto, irrigation works for the reclamation of lands in Blaine, Gooding and Lincoln counties.   On January 2, 1909, the parties entered into a supplemental contract, to cover additional lands proposed to be reclaimed.   In anticipation of such contracts, the said construction company acquired by assignment from the original permittees water permit No. 1817, issued by the state engineer on February 17, 1906, which authorized diversion of 3,000 second-feet of the waters of Big Wood and Malad Rivers, with a priority of November 16, 1905, the date of first receipt of the application for permit.   On June 29, 1922, water license issued, certifying to full compliance with the conditions of said permit, and the laws of Idaho, and confirming priority under said permit as of November

16, 1905. Meanwhile, in September, 1908, pursuant to the state contracts aforesaid, and in order the more conveniently to transfer ownership and control of the irrigation system to the water users, there was incorporated the Big Wood River Reservoir and Canal Company, Ltd., under the laws of Idaho, for the purpose of operating and managing the irrigation system so agreed to be built. The name of this corporation was later changed, in April, 1921, to Big Wood Canal Company, plaintiff herein. Following such incorporation, the construction company, from time to time, sold shares of stock in the operating company, as agreed with the state, each share of stock evidencing a water right for one acre of land, to various persons entering and agreeing to purchase the project lands. Water was thus sold for use upon the irrigable portion of 2,160 forty-acre tracts, of which 75,494 acres have been actually irrigated and reclaimed.

Among the provisions of the state contracts, it was stipulated that the operating company should have the management, ownership and control of the system as fast as the same was completed and turned over to it for operation by the construction company. The possession and control was actually turned over to respondent in March, 1921.

In 1909, the waters of Big Wood River and its tributaries were adjudicated in the district court of Lincoln county, in an action entitled *S. C. Frost et al. v. Alturas Water Co. et al.* Neither respondent nor its predecessor were parties to such action; respondent herein accepts said decree, and asks that it be made a party thereto. Respondent finally, in June, 1922, having made proof of compliance with its permit No. 1817, and having received license therefor, on February 7, 1923, commenced this proceeding, in order to become entitled to distribution as a decreed right. Appellants intervened, and claimed priorities over respondent's said permit No. 1817.

Respondent's amended complaint also sets up two other licenses, Nos. 3818 for 3,000 second-feet, with alleged prior-

ity of May 11, 1908, and 7,021 for 1.4 second-feet, with alleged priority of January 21, 1911. But the trial court, in its decree, gave all of appellants' rights priority over respondent under license No. 3818, except The Mutual Wood River Water Users Association, and gave all of appellants' rights priority over respondent under license No. 7021, except the Daubners and said association. It accordingly appears that there is no dispute over the priorities given license Nos. 3818 and 7021, respectively, and that the only controversy is with regard to the priority awarded respondent under license No. 1817, namely, November 16, 1905. This opinion in consequence has special regard only to license No. 1817. Appellants rely, with but one or two exceptions, upon permits and licenses intervening respondent's claim of priority of November 16, 1905, and the Frost decree in 1909.

Appellants filed a motion to strike portions of the amended complaint, and also a demurrer thereto. These having been denied and overruled, the appellants filed answer and cross-complaint, setting forth separately the rights of each. The cause was tried by the court without a jury. Findings, conclusions and decree were in favor of plaintiff, from whence comes this appeal.

There are twenty-two separate specifications of error, but counsel for both sides have argued them by groups, as several relate to the same question. Accordingly, we shall dispose of them by the same methods.

### Specifications of Error Nos. 1, 3 and 14.

[1] Specifications of error Nos. 1, 3 and 14 relate to the same question.

It is contended that S. H. Chapman, defendant herein, was not watermaster of Big Wood River District No. 7A when the action was commenced; that his designation as defendant gave the court no jurisdiction, and therefore the complaint did not state a cause of action, and the court could not enter a valid decree. It is not disputed that

Chapman was the duly elected and qualified watermaster in said district in 1917, and each year thereafter to and including 1924, nor is it suggested that anyone else held that office during said time.

The question turns mainly on the construction of C. S., secs. 5609, 5612 and 7036. They are, in part, as follows: (5609) "There shall be held on the first Monday in March in each year . . . . a meeting of all persons owning or having the use of an adjudicated right, in the waters of the stream or water supply comprising such district. . . . . At such meeting there shall be elected a *watermaster* for such water district, and such other regular assistants as such meeting shall deem necessary, and such meeting shall prior to the election of such *watermaster* and assistants fix the compensation to be paid them, such compensation not to exceed $7 per day during the time actually engaged in the performance of their duties. . . . . Provided, That should said meeting not be held, or should said *watermaster* not be chosen or his compensation fixed as above provided, then the department of reclamation must appoint such *watermaster* and fix his compensation not exceeding $5 per day. The department of reclamation may remove any *watermaster* . . . . and . . . . may appoint a successor for the unexpired term. Before entering upon the duties of his office, said *watermaster* shall take and subscribe an oath before some officer authorized by the laws of the state to administer oaths, to faithfully perform the duties of his office, and shall file with the clerk of the district court . . . . said oath and his official bond in the penal sum of $500, . . . . conditioned for the faithful discharge of the duties of his office."

(5612) "Said watermasters shall not begin their work until they have been called upon by three or more owners or managers of ditches or persons controlling ditches, in the several districts, by application in writing, stating that there is a necessity for the use and control of the waters of such district, and they shall not continue performing services after the necessity therefor shall cease, which shall

be determined by the department of reclamation, and in no event after the 1st of November of each year.''

(7036) ''Where the priority rights upon any stream . . . . shall have been determined by decree . . . . and thereafter it shall appear that any person or corporation having the right to the use of any part of said water was not included in said decree as a party thereto, and said right was not determined thereby, . . . . any such person or corporation may have such right adjudicated in the following manner: He may bring an action in the district court . . . . against the watermaster having charge of the distribution of the water of said stream, . . . . or if there be no watermaster thereof, then against the department of reclamation; . . . . ''

It is the contention of the appellants that, as the watermaster does not ''begin his work'' until after his election in March, and then only when called upon in writing by three or more owners or managers of ditches, and is prohibited by law from continuing to perform services after the 1st of November, there could be no watermaster on February 7, 1923, when the action was begun.

The statutes in question do not expressly fix the term of *office* of a watermaster. Sec. 5612, *supra,* fixes the term of *service,* and circumscribes the compensable period to that intervening the call to work and the cessation of necessity for work, in no event later than November 1st. (*Walker v. Elmore Co.,* 16 Ida. 696, 102 Pac. 389.) But there is nothing in sec. 5612 which expressly, nor, do we think, impliedly, confines the term of *office* of a watermaster to such irrigation season. The watermaster is paid a *per diem* compensation, and the legislative intent, as expressed in section 5612, is to prevent watermasters from beginning their work until called upon by an application in writing signed by sufficient water users. (*Walker v. Elmore Co., supra.*)

But while said sections do not now expressly fix the term of office of a watermaster, they did as originally enacted.

Sec. 5612 was formerly paragraph 27 of the act of March 11, 1903 (Sess. Laws 1903, p. 223), and paragraph 24 of said act (now C. S., sec. 5609) provided that "each watermaster shall hold office for one year or until his successor is appointed and shall have qualified." This provision was repealed in 1915.

A watermaster is a public administrative officer. (*Bear Lake County v. Budge,* 9 Ida. 703, 108 Am. St. 179, 75 Pac. 614; *Roberson v. People ex rel. Soule,* 40 Colo. 119, 90 Pac. 79.) As such, whether his term of office is considered as corresponding with his term of service, or as continuing until the first Monday in the following March, he holds office until his successor is elected or appointed and qualified. (C. S., sec. 74.) It was doubtless the existence of this general statute which caused the legislature to repeal the corresponding clause in sec. 5609, hereinabove mentioned, as superfluous. The conclusion is, therefore, that the provisions of sec. 5612 were not intended to fix the term of office of a watermaster. In view of the fact that defendant Chapman had been elected and qualified in March, 1922, and had not been removed, or the position otherwise vacated, we think he was the proper party defendant in the present proceeding. The demurrer, so far as defect of parties defendant is concerned, was therefore properly overruled. The trial court committed no error in holding that S. H. Chapman was watermaster at the time the action was filed, and that the action could be maintained against him as defendant.

### *Specifications of Error Nos. 1, 2, 3 and 18.*

[2] It is next contended that the plaintiff is not the real party in interest, that it is not the owner of the water rights in question, and is therefore not entitled to bring the action. The theory upon which the argument is based is that, under the federal Carey Act, the statutes of this state relating thereto, and paragraphs 9 and 10 of the state contracts aforesaid, it was not contemplated that the owner-

ship of either the works or the water rights should be in the plaintiff operating company, but only the right of operation, and that the ownership of the works and of the water rights is in the owners of the land.

It is stated, in paragraphs 9 of said contracts, as already mentioned herein, that it is necessary to have a convenient method of transferring ownership and control of the canal to purchasers of the water rights in said canal for certain purposes; that a corporation to be known as the Big Wood River Reservoir & Canal Company, Ltd., should be formed, with a capital stock of 150,000 shares, representing one share for each acre of land which would be irrigated from the canal; that at the time of the purchase of any water right there would be issued to the purchaser thereof one share of such capital stock for each acre of land entered or filed upon.  And then it is provided that:

"said Big Wood River Reservoir & Canal Company, Limited, shall have the management, ownership and control . . . . of said irrigation system as fast as the same is completed and turned over to it for operation by the said party of the second part . . . . "

Not only is it clear from such language that the legal title to the irrigation system and water rights should be in the operating company as soon as completed and turned over for operation, but it was held, in *State v. Twin Falls Canal Co.,* 21 Ida. 410, 121 Pac. 1039, L. R. A. 1916F, 236, under like contracts, that the purpose of organizing the operating company was to take over and hold the title to the canal system and water rights, and to operate and hold the same in trust for the settlers and land owners within the project.  Such holding of legal title by the operating company is not inconsistent with the language used in *Ireton v. Idaho Irr. Co.,* 30 Ida. 310, 164 Pac. 687, and *Boley v. Twin Falls Canal Co.,* 37 Ida. 318, 217 Pac. 258, cited by appellants.

No formal conveyance of title, however, was made by the construction company until April 20, 1923, following com-

mencement of the action, at which time a deed was executed and delivered. The court found, and is supported therein by the evidence, that the irrigation system was actually completed and turned over to the plaintiff operating company in March, 1921. Under the construction company's contracts, the plaintiff thereby became entitled to a formal conveyance of the irrigation system and water rights, and was the equitable owner of said system and water rights, as trustee for the settlers and land owners within the project, at the time the action was begun. This was sufficient interest to support an action for summary supplemental adjudication under C. S., sec. 7036. The trial court therefore committed no error in holding that plaintiff was the owner of the irrigation works and water-rights, that it was the real party in interest, and that it was formed to own, control, manage and operate the project.

*Specifications of Error Nos. 4, 15, 16 and 17.*

[3] It is next contended that plaintiff and its predecessors in interest failed substantially to comply with the statutory conditions in order to entitle it to the priority of November 16, 1905, the date of application for permit No. 1817, and numerous instances are cited wherein such default is alleged to have occurred. Application for the permit was approved February 17, 1906, and, under the laws then in existence, it was necessary to complete the works, and make proof thereof, on or before February 17, 1911, and to completely apply the water to the proposed use on or before February 17, 1915. The court found, and the evidence is, that plaintiff's predecessor substantially complied with the requirements as to completion of works, and proof thereof, on or before February 17, 1911. It is, however, asserted that there was failure to notify the state engineer that the permittee was ready to make proof of completion of works, but it is shown that this was done under date of December 14, 1910. It is said that there was failure of the state engineer to order publication of notice

thereof, and to make examination of the works before the proof. Section 4 of the act of March 11, 1903, does not provide in what manner the state engineer shall order publication, whether orally or in writing. It is shown by affidavit of the publisher that notice was actually published in the "Richfield Recorder" for five weeks, which is a full compliance with the law in that respect. Section 5 of said act of 1903 also provides for an examination by the state engineer on or before the date set for receiving proof of completion of works, and it is said that there is no proof of such examination. But by his certificate of completion of works, dated July 19, 1911, the state engineer certifies that The Idaho Irrigation Co., Ltd., "has fully complied with the provisions of the laws of the State of Idaho relating to the proof of completion of works of diversion set out and described in said permit; that said works are adequate for diverting and conveying to the place of intended use 3,000 second-feet of the waters of Big Wood and Malad Rivers . . . . " It will be presumed, in the absence of evidence to the contrary, that the state engineer performed his duty, and made such examination and inspection in order to make the above certificate.

But proof of application to beneficial use was not submitted until February 17, 1921, six years after the time permitted by the statutes in force when application for permit was made. By the 1913 Session Laws, p. 136, approved March 1, 1913, Rev. Codes, sec. 3253, was amended so as to provide that a permittee might have *six* years after the date set for the completion of works within which to apply the water to the proposed use. Under this amendment the state engineer, on November 30, 1914, upon request, extended the time for making proof of beneficial use under permit No. 1817 to February 17, 1917. By the 1915 Session Laws, p. 216, approved March 12, 1915, Rev. Codes, sec. 3260 was amended to provide, in part, as follows:

" . . . . Provided also, that whenever irrigation systems cover more than twenty five thousand acres, that proof of

beneficial use may be made at any time within a period of ten (10) years from the date set for the completion of the works, and in all such cases, proof of beneficial use may be made by the persons, company, or corporation constructing the irrigation works on behalf of the project, and in such cases, the lands upon which the water has been used need not be described by legal subdivisions but may be described generally as the lands under the irrigation system and it shall only be necessary to show in such cases that the quantity of water beneficially applied for irrigation has been applied within the limits of the project.''

Under and by virtue of this proviso, the state engineer, on December 31, 1915, upon request, again extended the time for making proof of beneficial use under permit No. 1817 to February 17, 1921, on which date, and after substantial compliance as to notice, the construction company made proof of beneficial use, which proof was accepted by the state engineer, and license No. 1817 issued June 29, 1922, confirming the right to the use of 3,000 second-feet with a priority of November 16, 1905.

[4] At this point, appellants assert that the minutes of the state board of land commissioners of April 29, and June 29, 1921, indicate that the works were not yet completed as of that date, but were finally accepted as complete April 3, 1922. At such meetings the matter considered was not whether the permittee had completed the works in accordance with the stipulations of the application and permit, under C. S., sec. 5575, but had reference only to whether or not the construction company had performed its engagements under its various contracts with the state of Idaho. An examination of such contracts shows that the specifications as to work to be done were not only far more in detail than the conditions of the permit, but were subject in each instance to approval by the state land board, or state engineer. The purpose and object of requiring proof of completion of works under C. S., sec. 5575 is to ascertain ''whether or not they (the works) conform to the terms of

the application and permit, and are capable of diverting the amount of water intended." Substantial conformity with such application and permit is all that is required. Whereas, under the state contracts with the construction company, the state is vitally concerned with the question whether the system has been fully completed in such manner, under the specifications, as to constitute a practical working irrigation system, capable of sufficiently irrigating all the lands for which water has been sold, and in proper condition to be turned over to the settlers for operation. There is no inconsistency between acceptance of works under C. S., sec. 5575, and refusal by the state to finally accept an irrigation system as a whole as a complete performance of construction contracts.

[5] Appellants also assert that the permittee failed to give notice to the state engineer of readiness to make proof of application to beneficial use, and that the state engineer failed to order publication of notice of intention to submit such proof. The record does not show a copy of the notice to the state engineer of readiness to make such proof, nor of the state engineer's order for publication. The record does show, however, that notice of intention to submit such proof, over the signature of the state engineer, was actually published as required by law. It will be presumed, in the absence of evidence to the contrary, that such notice was published only after previous notice to the state engineer, as required by law, of readiness to do so, and an order by the state engineer for such publication. There was substantial compliance with the statutes in these matters.

[6] It is also objected that the identity of the land to be reclaimed was materially changed by amendment of the permit, so as to destroy the priority thereunder. It appears from the record that two applications for amendment of the list of lands to be reclaimed were filed and approved, the first on January 10, 1911, and the next on January 20, 1914. It is provided by C. S., sec. 5571, that the place of

intended use may be changed, or the list of lands corrected, without losing priority of right, provided no additional amount of water is asked for, and the rights of others are not adversely affected by such change. It is not contended that any additional water was asked for, and it is not shown wherein the rights of others were adversely affected.

[7] Then it is contended that the application for permit No. 1817 was for the appropriation of direct flow from the river for agricultural purposes, and not an application to store the flood or winter flow. It does not appear, either from the application, the permit or the license that the applicants proposed to confine the appropriation to direct flow of the river; rather does it appear that they intended from the beginning to store the waters of the stream in reservoirs to be constructed for that purpose. C. S., sec. 5569, providing for application for permit, was not amended to provide expressly for flood or winter flow waters until Sess. Laws 1913, p. 136. However, C. S., sec. 5556, vested control of all waters of the state in the state of Idaho. The state, by its contracts previously herein described, expressly provided for storage dams to impound and store all the waters of Big Wood and Malad Rivers not otherwise appropriated. We think that, under these contracts, the permittee was authorized to appropriate all waters of the streams in question, whether direct flow or flood or winter flow, up to the amount specified in the permit.

[8, 9] But notwithstanding the permittee has complied substantially with the statutes relating to acquirement of rights by permit, as amended from time to time with respect to the time within which proofs of application to beneficial use might be made, appellants urge that the statutes as they existed at the time of respondent's application for permit, and at the time of appellants' applications for permit, being the laws in force prior to 1913, constitute a contract between the state of Idaho and each of said appellants; that the legislature could not thereafter change the laws

so as to extend additional favors to respondent so as to give it a property right which it could not have obtained under the laws as they existed at the time the respondent made its application, or at the time when the appellants secured their permits, when the effect of such legislation would be to deprive the appellants of their water rights which they had acquired under existing laws of the state. They say that any attempt to construe the acts of the legislature of 1913, p. 136, and of 1915, p. 216, as applying to the respondent's permit No. 1817, would render such statutes retroactive and void under art. 11, sec. 12, of the constitution of the state of Idaho, and would deprive the appellants of their property without due process of law, contrary to the fourteenth amendment to the constitution of the United States, and contrary to art. 1, sec. 13 of the constitution of the state of Idaho. In making such contention the appellants have particular reference to the provisions of the amendments permitting six and ten years respectively in which to make proof of beneficial use, and changing the method of proof by providing that the lands need not be described by legal subdivisions in the various notices and papers, but may be referred to as lands under specific irrigation systems, and only requiring proof that the quantity of water has been beneficially applied upon the project, and in extending these privileges to systems of more than 25,000 acres only.

*In limine,* it is important to understand that the appellants do not complain of any impairment of their own relations with the state. Indeed, as to the law of 1913, it was equally applicable to them as to the respondent, and constituted, not a diminution of rights, but an extension thereof, permitting a longer time within which to make proof of beneficial use. The real ground of complaint is that, by such extension of time availed of by respondent's predecessor, a possible forfeiture, due to failure to apply the waters to the proposed use, was avoided.

Counsel for appellants cite no authorities, and we have been unable to find any, on the particular situation in hand, and it is therefore necessary to reason by analogy. It seems that the case is not different from that wherein a subsequent lienor complains of a statutory extension of the superior lien. At the time appellants initiated their water filings, the rights of respondent's predecessor, under permit No. 1817, were fixed, and superior in point of time. These rights, based upon such permit, and substantial compliance with the statutory requirements as to construction of works thereunder, were not barred by lapse of time, nor default in any other respect, and, except for the statutory amendments referred to, might have ripened into absolute rights well within the time originally allowed by law. But in 1913, and while respondent's predecessor still had two years within which to apply the water to the proposed use, the legislature amended the law to provide six, instead of four, years, within which to make such application, thereby extending the time to make such application to the year 1917; again, in 1915, and while the rights were still in good standing, the time was again extended, as to irrigation systems covering more than 25,000 acres, to ten years. The legislature did not, by these acts, remove a statutory bar to a right that had already become complete; it merely suspended the operation, and postponed termination, of the period in which the work must be done to keep the rights alive. Such statutes ought to be sustained as constitutional, because they merely affect the remedy, and to the extent at least that they do not purport to affect actions already barred, they may be made to apply to rights that have arisen prior to their passage. (*City of Paragould v. Lawson,* 88 Ark. 478, 115 S. W. 379; *Hart v. Bostwick,* 14 Fla. 162; *Trimble v. Vaughn,* 6 Bush (Ky.), 544; *Mister v. McLean,* 43 Miss. 268; *Smith v. Tucker,* 17 N. J. L. 82; *Bentinck v. Franklin,* 38 Tex. 458; *Cardell v. Carpenter,* 43 Vt. 84; 12 C. J. 980.) In *Hart v. Bostwick, supra,* the court says:

"The authorities seem to fully establish the rule that when mere inchoate rights are concerned, depending for their original existence upon the law itself, they are subject to be abridged or modified by law, and that statutes of this character apply to such rights existing at the time of their passage, provided a reasonable time is given after the passage of the act, and before it would operate as a bar, for the party to exercise the right."

Statutes are held to be valid which extend the time for the enforcement of an already existing right. In *Klatt v. City of Detroit,* 162 Mich. 186, 127 N. W. 409, it was held that the legislature has power to extend or repeal a statute of limitations, or abolish the rule of adverse possession, and that such law will apply to cases where the period has not already run, or title been previously acquired.

In *Ellison v. Tuckerman,* 24 Colo. App. 322, 134 Pac. 163, the court had under consideration an amendatory statute extending the time of maturity of chattel mortgages. The act took effect after the execution, delivery and recording of a certain chattel mortgage, but before an extension of time was made. There were certain defendants who claimed as junior lienors, and they contended that, under the amendatory act, the rights of the junior lienors attach *eo instante* of the expiration of the original period for payment, a theory parallel to that of appellants here, who claim that their rights attached when respondent's proofs were not made as required by the original laws. The court said:

"It is purely a remedial statute amendatory of an act theretofore existing, and applied to mortgages in force at the time it became effective as well as to those subsequently executed, and is not obnoxious to the constitutional inhibition against retrospective legislation. *Aultman & Taylor Machinery Co. v. Fish et al.,* 120 Ill. App. 314."

See, also, *Cobb v. International State Bank,* 67 Colo. 488, 186 Pac. 529.

Again in *Harvey v. Ciocco et al.*, 32 Ohio C. C. 379, there was under consideration the question whether under a remedial act of the legislature extending the time of refiling chattel mortgages from one to three years, a mortgage that was filed before the passage of the amended act was void as to creditors if not refiled within thirty days from one year from the time of its original filing. The language of the court is so pertinent here that it is quoted at some length:

"The amended act is word for word similar to the original law with the exception that the phrase 'one year' is changed to 'three years,' and it is clear to our mind that the amended act only related to the time of refiling, and had no other effect or purpose. It did not change the original contract; it merely extended the life of the lien from one to three years without the necessity of refiling within thirty days from the expiration of one year from its date. . . . . In so acting the legislature was within the province of its constitutional powers. It was for it to decide, if it saw fit so to do, what conditions should attach to a chattel mortgage after it was given as to its continued life and efficiency just as much as it was within its power to pass a law, permitting a lien to be acquired by means of a chattel mortgage in the first instance. . . . . The plaintiff, however, contends that the legislature had no power to so lengthen the life of a mortgage then executed and on file, because so to do would work an impairment of the obligation of contracts. And he argues that as the law is a part of all contracts, that the creditors were parties to the original contract in relation to this mortgage. But we search in vain to find in what manner creditors sustain a contractual relation to this mortgage. For their benefit, and by grace of legislative enactment they may have an interest in the property, if the mortgage holder does not comply with the conditions attached by the law permitting the existence of such mortgage. The law in existence at the time the required condition is to be exercised certainly

is the law that should govern. . . . . But this law has noth-
ing to do with the execution of the mortgage or its fil-
ing. . . . . It only applies to the time of refiling. In this
case the time for refiling had not yet occurred. It was an
event to occur in the future upon which the law was to or
could act. It did not give life to something that was long
since dead or place new conditions or restrictions upon a
past transaction. It was prospective and not retroactive in
its effect and operation. It is also claimed that if allowed
to apply to the mortgage it would be an impairment of
vested rights. As indicated before, we do not see how it
could so act. These creditors had no vested rights in or to
the property covered by this mortgage. They did not even
have a judgment until long after the mortgage was given.
At most, their interest was remote and speculative and
until the mortgage was satisfied they had nothing or could
claim nothing."

In discussing another remedial statute, which it was
claimed was retrospective and void, it was said in *Towanda
Borough v. Fell*, 69 Pa. Super. Ct. 468:

"The legislature had the power, before this work was
done, to provide that the claim should be filed within a
period greater than six months, or that it might be filed
at any time after demand made upon the lot owner. . . . .
This defendant was not induced to do anything which might
operate to his prejudice because of the failure of the borough
to file the claim within six months after the work was com-
pleted, and no equities have arisen to excuse him from pay-
ment. It was, therefore, within the power of the legislature,
by a retrospective statute, to make legally enforceable the
equitable claim of the public by enacting that the claim
might be filed after the expiration of six months. . . . . It
is to be observed that this provision relates to procedure;
it has nothing to do with the equitable rights of the public
to have contribution."

It is settled law in this state that the legislature may by
proper legislation regulate the appropriation and use of

public waters. This the legislature has done by C. S., sec. 5568 et seq. These statutes prescribe minutely the steps of procedure to be taken to acquire a right to put such public waters to a beneficial use. By application for permit under such statutes the permittee secures an inchoate right which will ripen into a legal and complete appropriation by compliance with the statutory steps. Such right is merely a contingent right, which may ripen into a complete appropriation, or may be defeated by a failure of the holder to meet the statutory requirements. The permit, therefore, is not an appropriation of the public waters of the state. It is not real property. It is merely a consent given by the state to construct and acquire real property. (*Speer v. Stephenson*, 16 Ida. 707, 102 Pac. 365.) One who makes a filing, or initiates a right with knowledge, on public waters of this state, subsequent to a previously initiated right, does so subject to such previously existing right, and the substitution by the legislature of a different method of procedure for the perfection of such previously initiated rights, even to an extension of time in which such rights may be perfected, does not necessarily contravene any constitutional inhibition. These amendments only make more effective the remedy for the enforcement of a pre-existing right, without impairing the appellants' claims, for the respondent's predecessors could have, so far as we know, proceeded under the previous law, perfected their rights, and cut off the appellants' inchoate rights, as appellants' rights were at all times subject to the prior rights of the respondent's predecessor in interest. Appellants misconceive their rights which, having been subordinate to these of respondent at the time of their initiation and perfection, were not adversely affected by a subsequent change of law of procedure for perfecting respondent's superior rights.

[10-14] Then it is contended that the proviso of March 12, 1915, is class legislation. It is true that said statute grants special rights and privileges to persons or corporations owning irrigation systems covering more than 25,000

acres, by extending the time to prove beneficial use to ten years, by eliminating the necessity for describing the lands irrigated by legal subdivisions, and by requiring proof only of application of water to lands within the project. But the proposition that such classification is in violation of constitutional principles is not supported by law. It is asserted that no class can be made of those who appropriate more than a certain amount of water, but the reasonableness of such a distinction is apparent. *Crom v. Frahm*, 33 Ida. 314, 193 Pac. 1013, relied upon by appellants, deals with an arbitrary and unreasonable classification whereby Carey Act corporations, having more than 300 stockholders, were given special rights, powers and privileges over other corporations with an equal number of stockholders, although organized and existing for the control and management of like enterprises, but which have procured their canal systems from other than Carey Act construction companies. The act of March 12, 1915, makes no such distinction. It applies to any irrigation system, and its classification relates solely to size. The legislature may lawfully distinguish, select and classify objects of legislation, and necessarily the power must have a wide range of discretion. If the classification is practical, that is sufficient, and it is not reversible unless palpably arbitrary. (*State v. Calloway*, 11 Ida. 719, 114 Am. St. 285, 84 Pac. 27, 4 L. R. A., N. S., 109.) The question of classification is primarily for the legislature, and before a court can interfere with the legislative judgment, it must be able to say that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched; and the burden of showing that the law is unreasonable and arbitrary rests upon the one who assails it. (6 R. C. L., pp. 384–386, secs. 376, 377.) In some cases, size may be an appropriate index so that discrimination may properly be made between large and small. (6 R. C. L., p. 389, sec. 381.) The discrimination must rest upon some reasonable ground of difference between the persons or things included and those

excluded, having regard to the purpose of the legislation, and, within the sphere of its operation, the statute must affect all persons similarly situated. The constitutional requirement of uniformity in the case of a general law is complied with if it operates alike upon all persons or property under the same circumstances and conditions. (*State v. Sherman,* 18 Wyo. 169, Ann. Cas. 1912C, 819, 105 Pac. 299, 27 L. R. A., N. S., 898.) With these rules in mind, it is not difficult to justify the discrimination here established. Both as to the time necessary to complete the application of water to beneficial use, and the detailed description of lands to which applied, there are reasonable differences which distinguish a large from a small irrigation project. The propriety and nature of legislation having to do with the procedure for perfecting rights to use the public waters of the state are peculiarly within the province of the legislature, and there is nothing palpably unreasonable or arbitrary in the provisions of the act of March 12, 1915, upon which attack has been made. We therefore hold that it is not subject to such assault, and is valid.

The further contention is made that the respondent's works have not sufficient capacity to distribute 3,000 second-feet under its license No. 1817, not to speak of 3,000 feet under permit No. 3818 and 1.4 second-feet under permit No. 7021. The argument is based entirely upon the theory that storage rights are not covered by the permits. We have already, we think, disposed of that point. While the evidence shows that the total capacity of the various diversion works of respondent is between 2,500 and 2,800 second-feet, the company has been able, when the water was available, to store in its reservoirs not only the amount of water called for by the first permit, but also that represented by the other permits. We think the appropriation and application of the water called for by respondent's various permits are sufficiently established by the evidence. The trial court did not err in denying appellants' motion for a non-

suit at the close of the evidence.  Findings of fact Nos. 7, 9 and 15A are supported by the evidence.

*Specifications of Error Nos. 5, 6, 7, 8, 9, 10, 11, 12, 19 and 20.*

[15, 16]  Finally, it is urged that appellants have established a right to the use of the waters claimed by them by prescription, and that respondent and its predecessors, by the same token, have abandoned the use of such waters. The evidence shows that the watermaster distributed such waters to appellants for more than five years preceding the commencement of this action, before giving water to respondent, and that respondent had knowledge thereof, and that there was not sufficient water in the stream to fill both rights.  The trial court ruled that, intervening the application for a permit to use public waters, and final acquisition thereof by compliance with law as to construction of works and application to beneficial use, the use of such water by an intervening decree-holder could not constitute prescriptive use.  All of appellants' rights were decreed in the suit of *Alturas Water Company v. Frost,* in 1909, excepting two, that of Aller in 1912 and McKenzie in 1913, afterwards transferred to the Daubners.  This being true, it was absolutely incumbent upon the watermaster, during a scarcity of water, to treat the unadjudicated rights of respondent as inferior and subordinate to the decreed rights of appellants, and first supply appellants' decreed rights. (C. S., sec. 5611.)  Of this the respondent could not lawfully complain at any time before acquisition by it of a decreed award, as sought in this proceeding.  The distribution of water to a decreed right, in time of water scarcity, in preference to an undecreed right initiated by application and permit previous in point of time to that upon which the decree was based, is not an adverse use, but a permissive use, based upon the statutory duty of the watermaster to give preference in distribution to decreed rights. When a right to the use of unappropriated public waters has been initiated by application for permit, and proper steps have been taken to establish, preserve and perfect

such right by compliance with the conditions of the permit, then the right becomes vested, and dates back to the issuance of said permit. The state engineer, by granting a subsequent water permit, cannot interfere in any manner with vested rights of prior appropriators, and the perfection of rights under a subsequent permit can no more be allowed to interfere with the priority theretofore vested in the previous permittee. The trial court did not err in rejecting evidence of such intermediate use by appellants on the theory that such use could not be adverse to respondent or its predecessors in interest.

We recommend that the judgment be affirmed, with costs to respondent.

Babcock and Adair, CC., concur.

The foregoing is approved as the opinion of the court, and the judgment is affirmed. Costs to respondent.

Wm. E. Lee, C. J., and Taylor and T. Bailey Lee, JJ., concur.

Budge and Givens, JJ., concur in the conclusion.